**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CURTIS HOLDEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-3958 |
| | § | |
| ILLINOIS TOOL WORKS, INC. | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Curtis Holden ("Holden") sued his employer, Illinois Tool Works, Inc. ("ITW"), alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ITW moved for summary judgment on the basis of Holden's failure to exhaust and inability to make a *prima facie* showing of an adverse employment action. (Docket Entry No. 8). Holden responded, (Docket Entry No. 9), and ITW replied, (Docket Entry No. 11). This court issued a memorandum and order granting the motion in part and denying it in part. (Docket Entry No. 15). ITW has filed a motion for expedited reconsideration of the decision to deny summary judgment, (Docket Entry No. 16), and Holden has responded, (Docket Entry No. 18). Based on a careful review of ITW's motion for reconsideration, the record, and the applicable law, this court grants the motion, for the reasons explained below.[1]

---

[1] ITW also argues that this court improperly failed to consider evidence that twenty-two other employees were required to change shifts at the same time as Holden. ITW asserts that this demonstrates that Holden's shift change was the product of a plant reorganization, not retaliation. (Docket Entry No. 16 at 4-5). This argument was not raised in ITW's motion for summary judgment. ITW based its motion on the lack of administrative exhaustion and failure to satisfy the adverse employment action prong of the *prima facie* case.

ITW states that this court's memorandum and order gave insufficient weight to the fact that Holden's job duties, pay, benefits, and overtime compensation did not change for the worse following his transfer. ITW asserts that Holden worked more overtime hours and received a promotion after he and his wife filed EEOC complaints and lawsuits. (Docket Entry No. 16, 6-7; *Id.*, Ex. A at 1). This court dismissed Holden's retaliation claims that were based on his allegation that he was denied promotions. Holden has not asserted that he was denied overtime. The issue is whether ITW is entitled to summary judgment on the basis that the lateral transfer is not, as a matter of law, an adverse employment action.

Holden presented summary judgment evidence in the form of a sworn affidavit dated October 11, 2007 stating that in the new shift, he was required to work "side by side" with Frazier and Dawson, who Holden and his wife had accused of sexually harassing her and who, after the transfer, had "chastised and harassed" Holden. (Docket Entry No. 12, Ex. A at 2). ITW states that this court improperly failed to consider ITW's evidence that Holden did not, in fact, work alongside Frazier or Dawson after he was transferred to the new shift. ITW points out that Holden's affidavit contradicts Holden's June 15, 2007 deposition testimony that he "never" worked with Frazier or Dawson. (Docket Entry No. 16 at 5-6).

---

ITW did not base its motion on Holden's failure to raise a fact issue as to retaliation after he satisfied the elements of the *prima facie* case and after ITW proffered the plant reorganization as a legitimate, nonretaliatory basis for transferring Holden to a different shift.
    ITW states that this court improperly made a "finding" that "others" apart from Frazier and Dawson harassed Holden and asserts that there is no evidence that anyone else harassed him. (Docket Entry No. 16 at 6). This court did not make a "finding" that "others" harassed Holden, but merely stated that this was one of the allegations in Holden's complaint. (Docket Entry No. 15 at 3). This allegation was not the basis for this court's decision.

Holden issued a correction to his deposition on July 2, 2007, stating that he misunderstood the questions posed and that he "occasionally" worked with Frazier and Dawson after the shift transfer. (Docket Entry No. 8, Ex. A at 39, 108-09). ITW attached to its motion for reconsideration an affidavit by Ercel L. Albert, ITW's Human Resources Manager, stating that after the reorganization and shift transfer, Holden did not in fact work alongside Frazier or Dawson because they work in a different department. (Docket Entry No. 16, Ex. A at 1).

ITW asks this court to disregard Holden's affidavit statement that he had to work side by side with Frazier and Dawson after the transfer because this statement contradicts his deposition testimony that he "never" worked with these men. At the summary judgment stage, "the district court does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 126 S. Ct. 2064, 2089 (2006). There is a narrow exception to this rule for "sham affidavits" that are inconsistent with prior deposition testimony and the affiant does not account for the inconsistency. If an affidavit is inconsistent with prior deposition testimony without sufficient explanation, a court has the discretion to disregard the affidavit. *Tex. Sales and Mktg, Inc. v. Distinctive Appliances, Inc.*, Civil Action No. H-05-3555, 2007 WL 399292, at *6 (S.D. Tex. January 31, 2007); *see also Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (noting that the utility of summary judgment would be greatly diminished if courts were unable to screen out "sham issues of fact").

The first issue raised by ITW's argument is whether to consider Holden's correction to his deposition, stating that he "occasionally" worked with Frazier and Dawson after the transfer. Under Federal Rule of Civil Procedure 30(e), if a party or the deponent requests that the deponent have an opportunity to review the deposition transcript, the deponent must be given thirty days from the time the deponent is notified that the transcript is available to review the transcript and sign a statement listing "changes in form or substance" to his deposition along with the reasons for making them. The courts are divided over the type of changes permitted under Rule 30(e). The traditional view, still followed by the majority of courts, is that Rule 30(e) permits the deponent to change deposition testimony by timely corrections, even if they contradict the original answers. *See, e.g., Eicken v. USAA Fed. Savings Bank*, 498 F. Supp. 2d 954, 961-62 (S.D. Tex. 2007) (permitting changes to deposition testimony even when the majority of the 45 changes did not merely supplement but reversed the original answers); *EEOC v. J.H. Walker, Inc.*, Civil Action No. H-05-2232, 2007 WL 172626, at *10-13 (S.D. Tex. Jan. 18, 2007) (discussing both the majority and minority approach and applying the former); *Medina v. Horseshoe Entm't*, Civil Action No. 05-0097, 2006 WL 2038057, at *4 (W.D. La. July 19, 2006) (allowing contradictory corrections because "[u]nder the broad interpretation of Rule 30(e) . . . these contradictions and substantive alterations are permitted."); *Agrizap, Inc. v. Woodstream Corp.*, 232 F.R.D. 491, 493 n.2 (E.D. Pa.2006) ("After satisfying the procedural requirements of Rule 30(e), the majority view among federal decisions interprets Rule 30(e) to permit the deponent to make any kind of changes (corrections based on a claim of transcription error, or any other

substantive or procedural changes.)"); *Reilly v. TXU Corp.*, 230 F.R.D. 486, 490 (N.D. Tex. 2005) (finding that the plaintiff was entitled to correct his deposition, even though the changes altered his testimony in substantive and even contradictory respects, but that the defendants could then inquire about the reasons for the changes and ask follow-up questions); *see also Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir.1997); *U.S. ex rel. Burch v. Piqua Eng'g, Inc.*, 152 F.R.D. 565, 566-67 (S.D. Ohio 1993); *Lugtig v. Thomas*, 89 F.R.D. 639, 641-42 (N.D. Ill.1981); *Allen & Co. v. Occidental Petroleum Corp.*, 49 F.R.D. 337, 340 (S.D.N.Y.1970); *Colin v. Thompson*, 16 F.R.D. 194, 195 (W.D. Mo.1954); *De Seversky v. Republic Aviation Corp.*, 2 F.R.D. 113, 115 (E.D.N.Y. 1941).

Under this approach, the fact and extent of the change are treated as subjects for impeachment that may affect the witness's credibility. *See Lugtig,* 89 F.R.D. at 642 ("The witness who changes his testimony on a material matter between the giving of his deposition and his appearance at trial may be impeached by his former answers, and the cross-examiner and the jury are likely to be keenly interested in the reasons he changed his testimony. There is no apparent reason why the witness who changes his mind between the giving of the deposition and its transcription should stand in any better case."). The amended testimony does not replace the original testimony, which remains part of the record on which the witness may be examined and impeached. *See Podell*, 112 F.3d at 103 ("when a party amends his testimony under Rule 30(e), '[t]he original answer to the deposition questions will remain part of the record and can be read at the trial'") (citation omitted); *Medina*, 2006 WL 2038057, at *4 ("It should be noted that the original answers are not to be stricken, and

that the Defendant may use the original answers for impeachment purposes where appropriate.").

A growing minority of courts takes a more restrictive approach. Some courts permit a deponent to correct only typographic and transcription errors. In *Greenway v. International Paper*, 144 F.R.D. 322, 325 (W.D. La.1992), the court stated that "the Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all and then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination." Other courts apply the sham-affidavit rule to Rule 30(e) corrections, allowing them only if the deponent can provide a legitimate reason for the corrections demonstrating that the changes were not simply "purposeful rewrites tailored to manufacture an issue of material fact." *Hambleton Bros. Lumber Co. v. Balkin Enterprises.*, 397 F.3d 1217, 1225 (9th Cir. 2005); *accord Burns v. Bd. of County Comm'rs*, 330 F.3d 1275, 1282 (10th Cir. 2003) ("We see no reason to treat Rule 30(e) corrections differently than affidavits, and we hold that [the plaintiff's] attempt to amend his deposition testimony must be evaluated under [the sham affidavit doctrine]."); *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) (finding that Rule 30(e) changes that contradict the original deposition testimony should be dealt with the same way as subsequent affidavits that contradict a witness's earlier deposition). The sham-affidavit approach is slightly more permissive than the approach taken in *Greenway* because the deponent is not strictly limited to correcting typographic and transcription errors. Under the sham-affidavit approach, the

deponent may "change his deposition from what he said to what he meant" if the change does not directly contradict the original testimony, despite the fact that this may be "a questionable basis for altering a deposition." *Thorn*, 207 F.3d at 389. However, "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Thorn*, 207 F.3d at 389; *see also Hambleton*, 397 F.3d at 1226 ("We agree with our sister circuits' interpretation of FRCP 30(e) on this point, and hold that Rule 30(e) is to be used for corrective, and not contradictory, changes.").

In this case, Holden's correction directly contradicts his deposition testimony. Holden explains the contradiction by stating that he misunderstood the deposition questions, not that there was a transcription or typographic error. (Docket Entry No. 8, Ex. A at 39, 108-09). The change is permissible under the majority approach but impermissible under either minority approach. This court follows the majority approach. One court has concisely stated the arguments in favor of a broad approach:

> This interpretation, unlike the narrow interpretation, is consistent with the plain language of the Rule which expressly contemplates "changes in form or substance" accompanied by a signed statement reciting the reasons for the changes. As written, the Rule makes provision for changes in substance that are made for legitimate reasons, such as to correct a misstatement or honest mistake. This furthers the purpose of the discovery process – to allow the parties to elicit the true facts of a case before trial. In contrast, the narrow view prohibits all substantive changes, including corrective changes. While the Court wholly agrees that a deposition should not be a "take home examination," the broad approach allows for legitimate corrective changes while implementing adequate safeguards to prevent abuse . . . .

*Reilly*, 230 F.R.D. at 490. Under this approach, Holden's correction is part of his sworn deposition testimony. *See Lugtig*, 89 F.R.D. at 642.

Holden's corrected deposition testimony and affidavit, taken together, state that "occasionally" he had to work "side-by-side" with Frazier and Dawson. The affidavit and corrected deposition testimony are not inconsistent because Holden did not, in his affidavit, state how often or how much he had to work with Frazier and Dawson. The summary judgment evidence is that according to Holden, he occasionally had to work next to Frazier and Dawson; according to ITW, Holden never had to work next to Frazier and Dawson.

Resolving this disputed evidence in favor of Holden, the nonmovant, nonetheless results in a grant of summary judgment in favor of ITW. The Supreme Court recently rejected the position, previously adopted in this circuit, that an "adverse employment action" in a retaliation claim is limited to "ultimate employment decisions." In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405, 2409 (2006), the Supreme Court held that an adverse employment action "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee," which in the retaliation context "means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." The standard for harm is objective. *Id.* at 2415. "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not" satisfy the materiality requirement because these are ordinary tribulations "that often take place at work and that all employees experience." *Id.* The significance of an allegedly retaliatory act depends on the particular circumstances of the

8

individual employee. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)). The Fifth Circuit case law since *Burlington Northern* follows this approach. *Compare McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (applying the *Burlington Northern* standard), *with Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707-08 (5th Cir. 1997) (applying the previous Fifth Circuit standard).

A lateral transfer that does not reduce an employee's pay and benefits is not generally an adverse employment action, even under *Burlington Northern. See, e.g. Brown v. Brody*, 199 F.3d 446, 455-56 (D.C. Cir.1999) (applying the test later endorsed by *Burlington Northern* and finding that "[t]he clear trend of authority . . . is to hold that a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A survey of the relevant case law shows that the authority requiring a clear showing of adversity in employee transfer decisions is both wide and deep.") (citations and quotations omitted); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (applying the test later endorsed by *Burlington Northern* and finding that "[o]bviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either."); *Sabzevari v. Reliable Life Ins. Co.*, Civil

9

Action No. H-03-3240, 2006 WL 2336909, at *3 (S.D. Tex. Aug. 10, 2006) (finding that a purely lateral transfer was not an adverse employment action).

In *Washington v. Illinois Department of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005), the court explained that "[b]y and large a reassignment that does not affect pay or promotion opportunities lacks [the] potential to dissuade and thus is not actionable. But 'by and large' differs from 'never.'" *Id.* A lateral transfer that results in a significant, negative, and objectively tangible change in an employee's working conditions may dissuade a reasonable worker from making or supporting a charge of discrimination and could be a materially adverse employment action for the purpose of a retaliation claim. *See Washington*, 420 F.3d at 662 (finding that a lateral transfer could be an adverse employment action when an employer "set out to exploit a known vulnerability and did so in a way that caused a significant (and hence an actionable) loss"); *Brown*, 199 F.3d at 457 ("[A] plaintiff who is made to undertake or who is denied a lateral transfer-that is, one in which she suffers no diminution in pay or benefits-does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncracies of personal preference are not sufficient to state an injury.").

In determining whether a transfer results in a significant, negative, and objectively tangible harm, a court must consider the particular circumstances of the individual employee. *See Burlington Northern*, 126 S. Ct. at 2415-16. As the court explained in *Washington*:

> Suppose an employer knows that a particular worker has a nervous condition or hearing problem that makes him miserable when exposed to music for extended periods. Many people find music soothing and welcome its addition to the workplace. But if an employer sought to retaliate for a charge of discrimination by exploiting this vulnerability, moving him from a quiet office to one where Muzak plays constantly, that could be a material change if not, indeed, a constructive discharge . . . . Catbert, the Evil Director of Human Resources in the comic strip Dilbert, delights in pouncing on employees' idiosyncratic vulnerabilities. Perverse cleverness that is funny when limited to newsprint readily could be seen as discrimination when used to discomfit real people.

420 F.3d at 662. In *Washington*, an employee was reassigned to a new position that required her to work a different schedule. The court found that even though the transfer would not be discriminatory for many employees, it could be materially adverse for the plaintiff because the employer knew that the transfer would make it difficult for the plaintiff to both work and take care of her child. The court stated that the employer "may have a Catbert in its management, seeking out devices that would be harmless to most people but do real damage to select targets." *Id.*

The Supreme Court cited *Washington* approvingly in *Burlington Northern*, stating, "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." 126 S. Ct. at 2415. The Court gave another example of the need for individual fact-specific examination: "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.* at 2415-16.

11

In this case, the court initially concluded that Holden had raised a genuine issue of material fact as to whether his transfer resulted in a significant, negative, and objectively tangible harm as opposed to a "petty slight" or "minor annoyance." *Id.* at 2415. The basis for the court's conclusion was that Holden had a special "vulnerability" because Shift A included employees whom Holden's wife had accused of sexual harassment, and that requiring him to work alongside these coworkers could be as materially adverse as requiring a person with auditory sensitivities to work in an office where Muzak plays constantly. *Id.* However, closer examination of the record undermines this conclusion. Holden's summary judgment evidence, taken in the light most favorable to him, is that after the transfer to Shift A, he only "occasionally" had to work with Frazier and Dawson. There is no evidence suggesting that Holden worked with Frazier and Dawson on a regular basis. The law is clear that to show that a lateral transfer involving no diminution in work duties, compensation, or benefits is an adverse employment action, the employee must make a clear showing of significant negative consequences affecting the terms or conditions of employment. Being required to work "occasionally," as opposed to regularly, with Frazier and Dawson does not rise to such a level. The prospect of being forced to only occasionally work with coworkers who have harassed an employee's spouse would not deter a reasonable employee from complaining about discrimination. In *Washington*, by contrast, the facts involved a transfer that affected every day of the employee's life by making it extremely difficult for her to care for her child. The example used in *Washington* involved an employee with a known auditory sensitivity being exposed "constantly" to Muzak. The lunch example used in *Burlington*

*Northern* involved being excluded every week from an important training opportunity. 126 S. Ct. at 2415-16. By contrast, Holden's only summary judgment evidence is that he was occasionally required to work with Frazier and Dawson, who verbally "chastised and harassed" him because he could not "control" his wife. There is no evidence in the record that Frazier and Dawson harassed Holden apart from the occasional times when they worked together. Holden has not satisfied the *prima facie* case requirement of showing that he was transferred under circumstances that could dissuade a reasonable worker in his position from making or supporting a discrimination charge.

    ITW's motion for reconsideration is granted.

        SIGNED on December 27, 2007, at Houston, Texas.

                                                            _____
                                                              Lee H. Rosenthal
                                                          United States District Judge